## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UBALDO SANDOVAL,**

      **Plaintiff,**

    **vs.**                                                    **Civ. No. 14-817  KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

### <u>MEMORANDUM OPINION AND ORDER</u>[1]

    **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion"), filed on May 18, 2015.  (Doc. 17.)  The Commissioner of Social Security ("Commissioner") filed a Response on July 15, 2015 (Doc. 22), and Plaintiff filed a Reply on August 11, 2015.  (Doc. 25.)  Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

### I.  <u>Standard of Review</u>

    Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[2]; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).   If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to Magistrate Judge Kirtan Khalsa to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 7, 9.)

[2]  A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II. <u>Applicable Law and Sequential Evaluation Process</u>

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the claimant cannot show that his impairment meets or equals a Listing, but he proves that he is unable to perform his "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

despite the presence of counsel." *Henrie*, 13 F.3d at 361. "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

### III. <u>Background and Procedural Record</u>

Plaintiff Ubaldo Sandoval ("Mr. Sandoval") was born on December 16, 1966. (Tr. 166, 170.[4]) Mr. Sandoval attended school in Mexico and completed the seventh grade. (Tr. 35, 199.) Mr. Sandoval's work history included temporary staffing service jobs,[5] street sweeper, and cooking in a coffee shop. (Tr. 219-23.) Mr. Sandoval speaks and understands Spanish.[6] (Tr. 198.)

On April 4, 2011, Mr. Sandoval protectively filed[7] an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, and concurrently filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3). (Tr. 166-69, 170-74.) Mr. Sandoval alleged

---

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 14) that was lodged with the Court on February 20, 2015.

[5] Mr. Sandoval reported he cleaned floors and did construction work. (Tr. 220.)

[6] Mr. Sandoval testified at the administrative hearing with the assistance of a Spanish interpreter. (Tr. 22, 33.) Mr. Sandoval testified that he could understand a few words in English. (Tr. 37.) Karl R. Moedl, M.D., noted in his consultative examination report that Mr. Sandoval had limited English. (Tr. 262.)

[7] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits. The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application. *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

a disability onset date of October 1, 2010, because of a right knee injury.  (Tr. 199.)

Mr. Sandoval has not engaged in substantial gainful activity since his alleged disability onset

date.  (Tr. 24.)  Mr. Sandoval's date of last insured was December 31, 2014.[8]  (Tr. 22, 195.)

Mr. Sandoval's applications were initially denied on July 28, 2011.  (Tr. 52-59, 60-67,

68, 69.)  At reconsideration on August 8, 2011, Mr. Sandoval reported no change in his current

condition.  (Tr. 94, 232-37.)  Mr. Sandoval's applications were denied again on December 16,

2011.  (Tr. 70-76, 77-83, 84, 85, 95-98, 99-101.)  On January 18, 2012, Mr. Sandoval requested a

hearing before an Administrative Law Judge ("ALJ").  (Tr. 102.)  Mr. Sandoval also updated his

disability report on that date and stated that his right knee was in constant pain, that he required

help with his personal care and household chores, and that he used crutches to walk.  (Tr. 240-

45.)  The ALJ conducted a hearing on November 15, 2012.  (Tr. 31-51, 102.)  Mr. Sandoval

appeared in person at the hearing with his attorney Michelle Baca.  (*Id.*)  The ALJ took

testimony from Mr. Sandoval (Tr. 34-46) and an impartial vocational expert ("VE"), Shawn

Hardeman.  (Tr. 46-51.)

On February 14, 2013, the ALJ issued an unfavorable decision.  (Tr. 16-30.)  At step one,

she found that Mr. Sandoval had not engaged in substantial gainful activity since his alleged

onset date.  (Tr. 24.)  The ALJ therefore proceeded to step two and found that Mr. Sandoval

suffered from the following severe impairments:  "degenerative arthritis of the right knee (lateral

gonarthrosis) and obesity."  (*Id.*)  At step three, the ALJ concluded that Mr. Sandoval did not

have an impairment or combination of impairments that met or medically equaled one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 24-25.)

---

[8] To receive benefits, Mr. Sandoval must show he was disabled prior to his date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

Because she found that Mr. Sandoval's impairment did not meet a Listing, the ALJ went on to assess Mr. Sandoval's RFC, which is used to evaluate the claim at both step four and step five.  20 C.F.R. §§ 404.1520(a)(4), 404.1520 (e, f, g), 416 920(a)(4), 416.920 (e, f, g).  The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can crouch, kneel, and crawl no more than occasionally.

(Tr. 25.)  At step four, the ALJ concluded that Mr. Sandoval was unable to perform any past relevant work.  (Tr. 28.)  At step five, the ALJ applied the Medical-Vocational Guidelines as a framework and determined that Mr. Sandoval was not disabled.  (Tr. 28-30.)

On July 8, 2014, the Appeals Council issued its decision denying Mr. Sandoval's request for review and upholding the ALJ's final decision. (Tr. 2-4.)  In reviewing his case, the Appeals Council considered a brief submitted by Ms. Baca summarizing the arguments before the Appeals Council.  (Tr. 5, 255-59.)  On September 8, 2014, Mr. Sandoval timely filed the instant action seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## IV.  <u>Analysis</u>

Mr. Sandoval asserts two arguments in support of reversing and remanding his case, as follows: (1) the record was insufficient and ambiguous regarding the effects of Mr. Sandoval's impairment on his functioning thereby triggering the ALJ's duty to develop the record; and (2) the ALJ's RFC assessment was unsupported by the evidence and she improperly used the grids as a framework to determine Mr. Sandoval was not disabled.  (Doc. 17 at 4.)  Because the Court finds grounds to remand as discussed below, the Court does not specifically analyze all of Mr. Sandoval's arguments.

### A.     <u>Duty to Develop the Record</u>

Mr. Sandoval argues there was insufficient medical record evidence to determine he was not disabled which triggered the ALJ's duty to develop the record.   (Doc. 17 at 9-12.) Specifically, Mr. Sandoval asserts that Dr. Moedl's findings regarding his knee and obesity demonstrate an impact on Mr. Sandoval's ability to do work-related activities, and that Dr. Moedl's consultative exam report failed to include a statement describing his opinion about what Mr. Sandoval could still do despite his impairments, as required by 20 C.F.R. 404.1519n(c)(6).   (*Id.* at 10-11.)   Mr. Sandoval further asserts that because Dr. Moedl failed to provide a functional assessment in his report, the ALJ should have recontacted Dr. Moedl for clarification instead of relying on the opinions from State agency nonexamining doctors.  (*Id.* at 11-12.)   The Commissioner argues that the opinions of the State agency nonexamining doctors were consistent with the medical evidence as a whole, and that the absence of a statement by Dr. Moedl regarding Mr. Sandoval's functional limitations does not make his report incomplete. (Doc. 20 at 9-11.)   For these reasons, the Commissioner contends the ALJ was under no obligation to recontact Dr. Moedl.  (*Id.* at 10.)   The Court disagrees.

### 1.    Medical Record Evidence

The medical record evidence here is minimal.   The record supports that on January 24, 2002, Mr. Sandoval injured himself when he fell and struck his right knee on the ground.[9] (Tr. 296-97.)   Dr. Carlos Esparza of New Mexico Spine initially diagnosed Mr. Sandoval with a "[r]ight knee ligamentous strain/sprain," and treated the injury with a steroid injection.  (*Id.*)   In the following weeks, however, Mr. Sandoval presented with an audible click in his right knee, and reported that his knee was unpredictably locking.  (Tr. 291-92, 295.)   On April 4, 2002, an MRI revealed

---

[9] Healthcare provider records related to this injury were copied to New Mexico Mutual Casualty, a workers' compensation insurance provider.  (Tr. 276-77, 280-83, 287-88, 291-92, 295-97.)

> Two areas of osteochondral abnormality associated with the posterior aspect of the lateral femoral condyle.  A large free fragment is associated with one area of injury. . . .
>
> Lateral meniscal tear . . . with degenerative arthropathy of the lateral joint space compartment.

(Tr. 293.)   On April 9, 2002, Dr. Esparza referred Mr. Sandoval to Dr. William Ritchie of New Mexico Orthopaedic Associates to pursue surgical intervention.  (Tr. 291.)

On August 14, 2002, Mr. Sandoval presented to Dr. Ritchie for a surgical consult.[10] (Tr. 287.)   On August 20, 2002, Dr. Ritchie performed a "[r]ight knee arthroscopy, subtotal lateral meniscectomy and debridement of osteochondral fracture with abrasion chondroplasty" to repair Mr. Sandoval's knee injury.  (Tr. 284-85.)   On August 29, 2002, post-surgical radiologic studies revealed that "the fragment that he had posterolaterally and appeared well fixed at surgery now has migrated into the suprapatellar pouch.  It appears loose."  (Tr. 283.)  In light of these findings, Dr. Ritchie performed a second right knee arthroscopic procedure on October 25, 2002, to remove the loose body fragment in Mr. Sandoval's right knee.  (Tr. 278-79.)   The operative report indicated that when the fragment was grasped, a portion broke off, which was removed.  (*Id*.)  However, "[t]he remainder of the fragment could not be grasped despite multiple attempts because of its size and thickness."   (*Id*.)   Dr. Ritchie subsequently referred Mr. Sandoval for physical therapy to work on strengthening and range of motion in the hope of improving his anterior knee pain.  (Tr. 277.)

On April 15, 2003, Mr. Sandoval presented to Dr. Samuel K. Tabet of New Mexico Orthopaedic Associates complaining of increased right knee pain.  (Tr. 274-75.)   Dr. Tabet noted that previous x-rays revealed "what looks like an osteonecrosis significantly deformed lateral

---

[10] Mr. Sandoval reported to Dr. Esparza and Dr. Ritchie that he waited to pursue surgery in the hope that his knee would get better with time.  (Tr. 287-88.)

femoral condyle with some bone spurring and changes over the lateral side as well." (Tr. 274.) Dr. Tabet assessed Mr. Sandoval with lateral gonarthrosis[11] and probable osteochondritis dissecans.[12] (Tr. 274.) Dr. Tabet indicated that Mr. Sandoval was a good candidate for unicompartmental arthroplasty (partial knee replacement), and that he did not think there were any other options. (*Id*.) Dr. Tabet's noted indicated that Mr. Sandoval would schedule the procedure "in turn." (*Id*.)

The next medical record is dated eight years later, on July 7, 2011, when Mr. Sandoval was referred by the Social Security Administration to Dr. Karl Moedl for a consultative exam.[13] (Tr. 261-63.) Mr. Sandoval reported extreme pain in his right knee since having the arthroscopic procedures several years ago. (*Id*.) Mr. Sandoval stated that he could walk about one block before resting, could lift about 10 pounds,[14] could stand at least one hour, and could sit for two hours or longer. (*Id.*) On physical exam, Dr. Moedl noted that Mr. Sandoval was unable to walk on his toes or heels and unable to squat because of pain in his right knee; he had limited motion in his right knee; the strength in Mr. Sandoval's right leg was 4/5 because he was protecting his right knee; and the straight leg raise test caused severe pain in Mr. Sandoval's right knee. (*Id*.) Dr. Moedl observed that Mr. Sandoval limped on his right leg to protect his right knee, and that Mr. Sandoval's right knee was deformed, swollen, and looked very painful.

---

[11] Gonarthrosis is arthritis that is localized to the knee joint. http://muellerrx.com/gonarthrosisarthritis-knee.

[12] Osteochondritis dissecans is a joint condition in which bone underneath the cartilage of a joint dies due to lack of blood flow. http://www.mayoclinic.org/diseases-conditions/osteochondritis-dissecans/basics/definition/con-20024803.

[13] The record indicates that a consultative exam was required as part of Mr. Sandoval's applications for disability benefits and supplemental security income because the medical record evidence was not sufficient to support a decision on his claims. (Tr. 62, 72, 79.)

[14] Dr. Moedl speculated that Mr. Sandoval could lift more than 10 pounds, but acknowledged that Mr. Sandoval stated he experienced pain in his right knee with lifting. (Tr. 261.)

(*Id.*)  Dr. Moedl's impression was "[d]egenerative arthritis, right knee, with pain and limited motion" and "obesity."  (*Id.*)

Mr. Sandoval also had x-rays of his right knee on July 7, 2011.  (Tr. 266.)  The radiology report indicated

> [t]he lateral femoral condyle has some flattening and subchondral sclerosis.  The joint space medially is minimally narrowed.  Marginal osteophytes are seen from the lateral femoral condyle and lateral tibial plateau.  Some sharpening of the intercondylar eminences.  Small amount of marginal osteophyte formation from the superior aspect of the patella.

> CONCLUSION:

> 1.   Subchondral bone changes at the lateral femoral condyle which may or may not be related to previous trauma.

> 2.   Mild arthritic change at the lateral side of the knee also noted.

(*Id.*)

There are no other medical records in Mr. Sandoval's file.

### 2.      State Agency Consultant Case Analyses

On July 27, 2011, State agency nonexamining medical consultant Lawrence Kuo, M.D., reviewed the record evidence and assessed Mr. Sandoval's residual functional capacity.  (Tr. 52-59, 60-67.)  Because Mr. Sandoval did not have any current treating sources, great weight was assigned to Dr. Moedl's opinion and the July 7, 2011, x-ray report.  (Tr. 56, 64, 74, 81.)  Dr. Kuo determined that Mr. Sandoval had the residual functional capacity to occasionally carry 20 pounds; frequently carry 10 pounds; stand and/or walk about 6 hours; six for about 6 hours; and an unlimited ability to push and/or pull.  (Tr. 56, 64.)  Dr. Kuo further assessed that Mr. Sandoval could frequently climb ladders, ropes and scaffolds; could frequently kneel; could frequently crouch; and that Mr. Sandoval should avoid extreme cold and workplace hazards. (Tr. 56-57, 64-65.)  On December 15, 2011, at reconsideration, State agency nonexamining

medical consultant Allen Gelinas, M.D., reviewed Mr. Sandoval's record evidence.  (Tr. 70-76, 77-83.)   Dr. Gelinas indicated there was no additional medical record evidence and it was reasonable for him to affirm Dr. Kuo's RFC assessment.  (Tr. 73, 80.)

### 3. The ALJ Failed to Properly Evaluate the Medical Opinions and Failed to Develop the Record

There are two errors here.  First, the ALJ erred in her evaluation of the medical opinions. Regulations require that regardless of the source, all medical opinions must be evaluated and weighed.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Further, the opinion of an examining source is generally entitled to more weight than a nonexamining agency physician who has never seen the claimant.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004); 20 C.F.R. §§ 404.1527(c)(1) and 416.927(c)(1).  Here, the ALJ assigned great weight to and adopted the State agency nonexamining physician opinions (Tr. 28), but was silent regarding what weight, if any, she assigned to Dr. Moedl, an examining medical source.   Further, the ALJ provided no explanation regarding why she favored the nonexamining source opinions over Dr. Moedl's. This is error.  *See Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003) (finding an ALJ must consider every medical opinion and provide specific, legitimate reasons for rejecting it).

Second, Dr. Moedl's consultative report was incomplete.  As such, the ALJ's reliance on the nonexamining source opinions, who afforded great weight to Dr. Moedl's opinion, is necessarily flawed.  Moreover, the incomplete report triggered the ALJ's duty to develop the record by recontacting Dr. Moedl for the missing information, which she did not do.  See 20 C.F.R. §§ 404.1519p(b), 416.919p(b).  This is reversible error.  *See Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) (finding the ALJ had a duty to recontact medical sources for additional information when the record evidence is inadequate to determine whether the claimant is disabled even when claimant is represented by counsel).

Regulations regarding consultative examinations provide as follows:

(b)     Report content. . . .  The medical report must be complete enough to help us determine the nature, severity, and direction of the impairment, and residual functional capacity.  The report should reflect your statement of your symptoms, not simply the medical source's statements or conclusions.  The medical source's report of the consultative examination should include the objective medical facts as well as observations and opinions.

(c)     Elements of a complete consultative examination. A complete consultative examination is one which involves all the elements of a standard examination in the applicable medical specialty.  When the report of a complete consultative examination is involved, the report should include the following elements:

. . .

(6)     A statement about what you can still do despite your impairment(s), unless the claim is based on statutory blindness. This statement should describe the opinion of the medical source about your ability, despite your impairment(s), to do work-related activities, such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling; and, in cases of mental impairment(s), the opinion of the medical source about your ability to understand, to carryout and remember instructions, and to respond appropriately to supervision, coworkers and work pressures in a work setting.  Although we will ordinarily request, as part of the consultative examination process, a medical source statement about what you can still do despite your impairment(s), the absence of such a statement in a consultative examination report will not make the report incomplete.  . . .

. . .

20 C.F.R.  §§ 404.1519n(b) and (c)(6), 416.919n(b) and (c)(6).    Thus, a complete consultative examination report should include the medical source's observations and opinions, and a statement regarding what Mr. Sandoval could do despite his impairments.  *Id*.; s*ee also Armer v. Apfel*, 216 F.3d 1086, at*3 (10th Cir. 2000) (unpublished)[15] (citing 20 C.F.R. 404.1519n(c)(6)) (noting that a complete consultative examination report calls for an RFC).  It is undisputed that

---

[15] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

Dr. Moedl's report did not contain his opinion or a statement regarding what Mr. Sandoval could do despite his impairments.  Further, the Commissioner's argument that the absence of such a statement in a consultative examination report will not make the *report* incomplete is misplaced because the regulations clarify that the exclusion of elements of paragraph (c) from a report is directly related to when a *complete* consultative examination is not required.  *See* 20 C.F.R. §§ 404.1519n(d), 416.919n(d) (describing when a complete consultative examination and report are not required such as when only a specific laboratory test result is needed to complete the record).  That is not the case here.

Here, there was no limitation on the consultative examination.  The disability determination explanations prepared in response to Mr. Sandoval's applications explicitly stated that a consultative examination was required because "[t]he evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim."  (Tr. 54, 62, 72.)  As such, the agency bore the responsibility to ensure that a consultative examination and report conformed to the regulations.  *Armer*, 216 F.3d 1086, at*3.  As previously stated, Dr. Moedl's report did not conform to the regulations because he failed to include any opinions or to provide a statement regarding what Mr. Sandoval could do despite his impairments.  The absence of these findings, given the objective evidence in this case, triggered an obligation on the part of the Commissioner to fully and fairly develop the record regarding the severity and limiting effects of Mr. Sandoval's impairments.  *See* 20 C.F.R. §§ 404.1519p(b), 416.919p(b).   The ALJ did not satisfy that obligation here.

On remand, the Court directs the ALJ to comply with the regulations and "contact the medical source who performed the consultative examination, give an explanation of [the]

evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." *Id.*.

  **B.**  <u>**ALJ's Credibility Assessment**</u>

  Although the Court has found a basis for remand as discussed above, the Court nonetheless addresses the ALJ's credibility assessment for consideration on remand. Here, the ALJ's credibility findings are not supported by substantial evidence. First, the ALJ found Mr. Sandoval incredible because he testified at the hearing he could speak only a few words of English yet Dr. Moedl noted Mr. Sandoval had "limited English." (Tr. 27.) This is a distinction without a difference.[16] "The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence[.]" SSR 96-7p, 1996 WL 374186, at *4. This finding is not grounded in the evidence.

  Second, the ALJ found Mr. Sandoval incredible because he testified he last worked in 2004, and that only when questioned did he admit that he last worked in 2010.[17] (Tr. 27.) This finding is likewise not grounded in the evidence because Mr. Sandoval testified that he last worked "[i]n 2004. It's been so many years, *I don't remember*." (Tr. 37.) (Emphasis added.) Moreover, Mr. Sandoval fully disclosed the entirety of his work history to the Social Security Administration at the outset of the application process. (Tr. 214-19.) Thus, Mr. Sandoval was forthcoming about his work history even though he had a momentary lapse of memory at the hearing regarding the year he last worked.

---

[16] Further, the ALJ's finding is in error because she mischaracterized Mr. Sandoval's testimony. Mr. Sandoval testified he could *understand* a few words of English. (Tr. 37.)

[17] Again, the ALJ mischaracterized Mr. Sandoval's testimony. Mr. Sandoval testified that he last worked "[i]n 2004. It's been so many years, *I don't remember*." (Tr. 37.) (Emphasis added.)

Third, the ALJ found Mr. Sandoval's testimony regarding when and why he used crutches contradictory and unpersuasive, because he appeared at the hearing using crutches, but had not disclosed on his Adult Function Report or to Dr. Moedl that he needed crutches. (Tr. 27.)  However, Mr. Sandoval testified that he started using crutches "about a year ago," and that his brother bought him the crutches.   (Tr. 38.)   This testimony is corroborated by Mr. Sandoval's updated disability report on January 18, 2012, ten months before the administrative hearing, wherein he indicated, *inter alia*, that he had begun using crutches to walk.  (Tr. 244.)  Further, Mr. Sandoval could not have disclosed the use of crutches on either his Adult Function Report or to Dr. Moedl because he was not using them yet.  The ALJ's finding makes no sense.

Finally, the ALJ found Mr. Sandoval incredible because "there is no recent evidence to show that he has sought medical treatment for knee pain."  (Tr. 27.)  However, aside from Ms. Baca's representation that Mr. Sandoval had been unable to obtain or afford medical treatment, the ALJ made no inquiry regarding Mr. Sandoval's own version of those facts.  A disability hearing is a nonadversarial proceeding, in which the ALJ has a basic duty of inquiry, "to inform [her]self about facts relevant to [her] decision and to learn the claimant's own version of those facts."  *See Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) (citation omitted). "The duty of inquiry takes on special urgency when the claimant has little education and is unrepresented by counsel."  *Id.* at 511.  Here, although represented by counsel, Mr. Sandoval did not speak English and had a seventh grade education.  Thus, the ALJ's duty of inquiry took on a special urgency.  Despite this special urgency, the ALJ made no inquiry as to these facts, and chose instead to rely on his counsel's representations.

Credibility determinations are peculiarly the province of the finder of fact; however, they must be supported by substantial evidence. *See Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010). The ALJ's findings are not supported by substantial evidence.

C.    **Remaining Issues.**

The Court will not address Mr. Sandoval's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

IV.  **Conclusion**

For the reasons stated above, Mr. Sandoval's Motion to Reverse or Remand for Rehearing is **GRANTED.** This matter is remanded for further proceedings consistent with the Court's findings.

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**